The PEOPLE of the State of
Colorado, Complainant,

v.

Gregory G. VERNON,
Attorney-Respondent.

No. 82SA117.

Supreme Court of Colorado,
En Banc.

Nov. 15, 1982.

Linda Donnelly, Disciplinary Prosecutor, Denver, for complainant.

Jack Westley Karford, P.C., J.W. Karford, Englewood, for attorney-respondent.

ERICKSON, Justice.

This disciplinary proceeding against the respondent, Gregory G. Vernon, was concluded by the Grievance Committee with findings of fact, conclusions, and a recommendation that respondent be suspended for a period of one year and one day, and that he be ordered to make restitution in the amount of $309 to Executive Transportation Limited. We approve the recommendation of the Grievance Committee and order that the respondent be suspended for one year and one day, that he make restitution in the amount of $309 to Executive Transportation Limited within a period of ninety days, and that he pay costs in the amount of $301.82. We also order that reinstatement be conditioned on the respondent making restitution as ordered and his proof of rehabilitation and compliance with the disciplinary orders in this case. C.R. C.P. 241.22.

The respondent was admitted to the practice of law in the state of Colorado on June 27, 1972, and has registration number 3705. He has voluntarily terminated his law practice since the events described in this opinion occurred.

In June of 1974, the respondent was asked to form a corporation to purchase a Bentley automobile for lease to the general public. Thereafter, he prepared documents which created Executive Transportation Limited (ETL). The respondent was not paid for his legal services in forming the corporation, but acted as attorney for the corporation and some of its directors and stockholders. He purchased stock in ETL and eventually became the corporate president and maintained the corporate books and records.

The shareholders of ETL, including the respondent, agreed to bear equally the costs associated with the operation of the company. The Bentley was purchased with funds obtained from a bank loan. The shareholders, including the respondent, individually executed the promissory note to the bank and agreed to obtain insurance on the Bentley. ETL did not prosper and by July of 1975, the shareholders sought to acquire a less costly insurance policy. The respondent wrote the shareholders and advised them that he could obtain insurance on the Bentley for $387 which was better than the $530 quoted to him for renewal of an existing policy.

Thereafter, a corporate check was issued to the respondent for $387 in July, 1975 for the specific purpose of obtaining insurance on the Bentley. The respondent deposited the check in his personal account and now

admits that the funds were never used for the purpose intended and that the funds were not returned to the corporation. Eventually, $78 was paid by the respondent for insurance coverage of a period immediately preceding the sale of the Bentley. When the respondent obtained the check for $387, he believed that amount was necessary to pay for insurance on the Bentley for one year, but he later learned that he would not have to pay that amount for insurance.

Shortly thereafter, some of the shareholders became suspicious and asked the respondent for a copy of the bill for the insurance premium. After many delays in January 1976, a stockholder went to the respondent's office and picked up what was purportedly a statement from the insurance company for insurance on the Bentley. The respondent admitted at the time of the hearing that he altered the statement by placing the number "3" in front of 78 to create the impression that ETL was billed and paid $378 for the insurance on the Bentley. He also admitted that he placed the date and indicated that the money was paid on the stub of the statement to obscure the amount due. The alterations were admittedly for the purpose of making it appear that $378 was paid, when in fact, not even the $78 set forth on the statement was paid.

Respondent's defense to his misleading and deceptive alterations was that they were inartfully done and did not allay the suspicions of the other stockholders. However, the intent to deceive is obvious from the record. In May 1976, in attempting to get one of the other shareholders to contribute and pay the corporate debts of ETL, the respondent claimed that he would receive a $300 refund from the insurance company by cancelling the insurance on the Bentley at the time of sale. In August 1976, the respondent wrote to a stockholder who was in charge of the books of account for ETL and stated, "I have received a return of insurance premium from AMICA Insurance in the amount of $300 which has been retained and credited to my capital account." A specific finding was made by the Grievance Committee that no refund was ever due to respondent and that no premium was ever paid to AMICA by the respondent.

The respondent's conduct in dealing with the other stockholders of ETL was punctuated by misrepresentation and fraud. He falsely stated the amount required, and eventually paid for insurance on the Bentley and claimed that he paid $378 for insurance when no such an expenditure was made. The respondent violated Disciplinary Rules DR 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation), DR 5–101(A) (accepting employment when his financial business or property will be affected and may impair his independent professional judgment), DR 5–104(A) (limiting business relations with a client to avoid conflicts of interest), DR 9–102 (preserving identity of funds and property of a client).

In addition, the respondent engaged in conduct which violated the high standards of honesty, justice, and morality required of lawyers. C.R.C.P. Rule 241(B). The respondent's corporate client, ETL, paid $387 to the respondent to obtain insurance on the Bentley. The funds were thereafter converted to the respondent's own use. The respondent then attempted to mislead his clients as to the use of funds by his alteration of business records. It was not money of the shareholders who owned the company and who contributed funds in accordance with their investment agreement, but the funds of respondent's client, ETL, that he converted to his own use.

Respondent now attempts to justify his action on the basis that he had contributed more than his share to the corporation. His theory does not constitute a valid defense, but merely points out his breach of a fiduciary duty to his corporate client. His alteration of the insurance statement, his failure to respond honestly when attempts were made to learn the truth about the status of the insurance premium, and his letters indicating that there would be a refund from the insurance company were all misrepresentations in violation of the Code of Pro-

fessional Responsibility and the Supreme Court Rules relating to the discipline of attorneys.

The sanction imposed is severe, but is required by the respondent's conduct. We take cognizance of the fact that the respondent has been the recipient of three letters of admonition for incidents which occurred after the events which are the subject of this disciplinary proceeding.

Accordingly, the respondent is suspended for a period of one year and one day, assessed costs of these proceedings in the amount of $301.82, and is ordered to make restitution in the amount of $309 to ETL. In accordance with the provisions of C.R. C.P. 241.22(b), it is ordered that the respondent be granted the right to reinstatement only when he proves by clear and convincing evidence that he has been rehabilitated and has complied with all of the applicable disciplinary orders imposed upon him in these proceedings, and that he is morally and ethically qualified to practice law.